**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**PAMELA J. JOHNSON**                                                              **PLAINTIFF**

        **v.**                    **Civil No. 05-5207**

**MICHAEL J. ASTRUE,**[1] **Commissioner,**
**Social Security Administration**                                              **DEFENDANT**

**J U D G M E N T**

    Now on this 23rd day of March, 2007, the captioned matter comes on for judicial review of the decision of the Commissioner of the Social Security Administration, denying plaintiff Pamela Johnson disability insurance benefits and supplemental security income benefits under the Social Security Act.

    1.   The Court's role upon review of the decision of a Social Security Administrative Law Judge ("ALJ") is to determine whether the decision is supported by substantial evidence on the record as a whole.  **Ramirez v. Barnhart**, 292 F.3d 576 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support a conclusion. *Id.*  The Court must consider not only the evidence supporting the ALJ's decision, but also that which fairly detracts from it, and must affirm if the record - viewed as a whole - contains substantial evidence to support the decision.  *Id.*   The Court may not reverse simply because the record also contains substantial

---

[1] Michael J. Astrue became the Social Security Commissioner on February 12, 2007, and pursuant to F.R.C.P. 25(d)(1) has been substituted for Jo Anne B. Barnhart as the defendant in this suit.

evidence that would have supported a contrary decision. **Haley v. Massanari**, 258 F.3d 742 (8th Cir. 2001).

The burden rests on the claimant to prove that she has a mental or physical disability that has lasted - or can be expected to last - at least one year and that prevents her from engaging in any substantial gainful activity. **Pearsall v. Massanari**, 274 F.3d 1211 (8th Cir. 2001).

2. Johnson alleged a disability onset date of March 26, 2003, due to carpal tunnel syndrome, arthritis of the hands, shoulder, and hip, anxiety, pain, and a nervous disorder of her legs.

Following a hearing on September 9, 2004, the ALJ found that Johnson had major depression, osteoarthritis, carpal tunnel syndrome, and spastic legs, and therefore had a severe impairments, but further found that these conditions did not, alone or in combination, meet or equal any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

The ALJ discounted Johnson's subjective complaints, finding them inconsistent with both her own reported level of activity and psychological symptoms, and with the reports of examining sources. He found that Johnson had the residual functional capacity to perform light work.

Based on evidence obtained from a Vocational Examiner obtained by way of interrogatories, the ALJ concluded that Johnson

had certain transferrable skills, including the ability to follow instructions carefully, to do the same thing repeatedly, to pay attention to safety rules, to work around machinery, and to exercise limited supervision.  He found that she could do work as a motel maid, fast food attendant, bus boy, or security guard, and that such jobs existed in significant numbers in the regional and national economy.  The ALJ thus concluded that Johnson was not disabled.

    3.  Johnson alleges that the ALJ erred in failing to consider her impairments in combination, failing to properly evaluate her credibility, and failing to develop the record with respect to her medical condition.

    4.  The relevant evidence from the administrative record may be summarized as follows:

    *    On November 10, 1994, Dr. David Davis, a Neurologist, saw Johnson for a two-month history of numbness in the right hand, and two-week history of numbness in the left hand.  She gave a history of a hard fall on her right side in 1993,[2] with treatment by Dr. John Park, who told her she had permanently damaged the shoulder. The level of numbness was affecting her sleep. Dr. Davis planned nerve conduction studies to evaluate the possibility of carpal tunnel syndrome.

---

[2] The medical records from this fall are not in the administrative record.

* On December 16, 1994, Dr. Davis wrote a letter with regard the denial of workers' compensation coverage for Johnson, stating it as his opinion that "it seems likely that the job precipitated or aggravated her carpal tunnel syndrome."

* On December 29, 1994, Dr. Davis noted that Johnson "is continuing to have numbness in her hands. She awakens at least once a night and has to get up and walk around to try to relieve the numbness. It is provoked in the day by minimal activity such as washing dishes. Today she had repeat median nerve conduction velocities which continue to show abnormalities in both hands." Dr. Davis referred Johnson to Dr. Heinzelmann for consideration for surgery.[3]

* On February 24, 1995, Dr. Davis noted that Johnson was under the care of Dr. Heinzelmann for carpal tunnel syndrome, and that her job, as described to him, likely "precipitated, aggravated or exacerbated" the condition.

* On July 17, 2003, Johnson completed a Disability Report. She indicated that her ability to work was limited by carpal tunnel syndrome in both wrists, arthritis of the shoulder and hip, a "nervous disorder of legs," and anxiety. She had left her job as an attendant in a dry

---

[3]Johnson testified that this surgery was never performed, and it appears that funding was an impediment.

cleaning establishment on March 26, 2003, because of these conditions. In her work she stood 8 hours a day, had to grip, pinch, and use foot controls, and supervised two other people. She took only ibuprofen ("about 15 tabs a day") for her pain and muscle spasms. She had an 8th grade education, and was 47 years old.

* On July 25, 2003, Johnson completed a Disability Supplemental Interview Outline. She indicated that she could bathe and dress herself and care for her hair, but did not shave because she would cut herself due to the numbness in her fingers. She did laundry, changed sheets, vacuumed, swept, took out the trash, and mowed the lawn, but did not do dishes, iron, make home or car repairs, wash the car, rake leaves, or do garden work, because she could not "hold anything without dropping." She shopped for groceries and clothes, cooked, drove and use public transportation, but did not walk because of the arthritis in her left hip. She spent her time watching television, reading, and visiting. She required a 30-45 minute nap daily. She described her conditions as causing numbness in both hands, pain in her elbows, pain in her right shoulder and left hip, and spastic leg movements. The pain was said to exist all the time, and be caused by repetitive movement. She

  took ibuprofen and used hot baths and heating pads to relieve it.

\* On September 19, 2003, Dr. Randy Conover conducted a General Physical Examination of Johnson.  Johnson gave a history of carpal tunnel syndrome since 1994 and arthritis of the neck and hips slowly worsening since 1998.  She said that she could walk 50 yards before sitting; could stand for 30 minutes but sit only for 15 minutes because of leg spasms and back discomfort.  She took only ibuprofen.  On examination, she had normal range of motion in all joints except her hips, which had 80 degrees of flexion out of a possible 100 degrees.  Her hands were enlarged, with swollen joints.  She exhibited positive Tinel sign[4] and Phalen maneuver.[5]  Dr. Conover estimated that Johnson's grip was 90% of normal, and found that she could hold a pen and write, touch fingertips to palm, oppose thumb to finger, pick up a coin, walk without assistive devices, heel-to-toe walk, squat and rise.  X-ray showed a decreased joint space in the hip.  Dr. Conover diagnosed osteoarthritis,

---

[4] A "sensation of tingling, or of 'pins and needles,' felt at the lesion site or more distally along the course of a nerve when the latter is percussed; indicates a partial lesion or early regeneration in the nerve." <u>Stedman's Medical Dictionary</u>, 28th Ed.

[5] A maneuver "in which the wrist is maintained in volar flexion; paresthesia occurring in the distribution of the median nerve within 60 seconds may indicate carpal tunnel syndrome." <u>Stedman's Medical Dictionary</u>, 28th Ed.

carpal tunnel syndrome, spastic legs, and anxiety, and found mild limitation on Johnson's ability to sit, and moderate limitations on her ability to walk, stand, lift, carry, handle, and finger.

* On September 25, 2003, Dr. Virginia Krauft, a Psychologist, conducted a mental status/adaptive functioning evaluation of Johnson. Johnson described her physical condition to Dr. Krauft as "numbness in her hands and swelling in her hands that make it impossible for her to work now," and legs that "are spastic and, at night, they seem to jerk in the night," along with shoulder and neck pain, causing a sharp pain when she turned her head to the right. She was taking some muscle relaxants that a friend had given her. Dr. Krauft estimated Johnson's IQ to be "80 or greater," and diagnosed Johnson with major depression,. She noted that Johnson's prognosis was "poor as she appears to live a very dysfunctional life and does not have a major support system at this time." Dr. Krauft also found that Johnson "may have adaptive functioning problems, particularly in the social and personal areas," but not such as to be consistent with a diagnosis of mental retardation. Dr. Krauft found no evidence of exaggerating or malingering. Johnson told Dr. Krauft

     that she was "able to perform household chores such as doing dishes and cleaning around the house."

* On October 9, 2003, a reviewing source, Dr. Linda Green, filled out a Residual Functional Capacity Assessment on Johnson.  She found Johnson capable of lifting 20 pounds occasionally, and 10 pounds frequently;  of standing, walking, and sitting about 6 hours in a normal workday; of limited capacity to use her arms and hands, with no frequent repetitive flexion of the wrists due to carpal tunnel syndrome.  No other limitations were noted.

* On October 28, 2003, another reviewing source, Dr. Kathryn Gale, filled out a Mental Residual Functional Capacity Assessment form on Johnson.  She found moderate limitations on the ability to carry out detailed instructions and maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; and the ability to set realistic goals or make plans independently. She opined that Johnson "is able to perform work where interpersonal contact is incidental to work performed,

   e.g. assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete."

* On November 17, 2003, Johnson completed a Reconsideration Disability Report. She indicated that since she had initially filed, changes in the weather made her pain worse, and that she did not drive much because of the condition of her hands and the stress of driving. She had a painful knot between thumb and wrist on the left, and had developed stress incontinence. It was difficult for her to "close buttons," and pull up her pants. She had not seen a doctor because she could not afford to do so.

* In an undated Claimant's Statement When Request For Hearing Is Filed, which appears to have been completed in March, 2004, Johnson indicated that the knot on her left thumb had gotten bigger and more painful, and that she could not grip with her left hand. Her restless leg syndrome had worsened and interfered with sleep. Her hand numbness was worse, and her hips hurt when she walked. She had not seen a doctor due to lack of funds. She had tried to be seen at a free clinic, but "cannot get in." She took ibuprofen, "up to 8 at a time."

* On April 1, 2004, Johnson's attorney submitted a Pre-

hearing Memorandum in which she listed Johnson's impairments as arthritis of the hands and elbows; bilateral carpal tunnel syndrome; restless leg syndrome; hip pain with numbness; right shoulder pain; and depression. Johnson's daily activities and condition were narratively stated as follows: "I have a lot of trouble with both hands. I cannot grip, and when I try to hold on to something, I often drop it. I cannot open jars or bottles. I cannot write more than a very small amount and I cannot button my buttons. I cannot even hold a book to read it. I cannot lift because of my hands and my shoulder. I have had carpal tunnel syndrome for many years. I have a difficult time sleeping, because if I roll over onto my right shoulder, it is extremely painful and wakes me up. My hands also hurt at night. I have a hard time walking or sitting because of my hip pain. I cannot sit for very long because of my restless leg syndrome. I have a lot of problems with my memory and concentration. I have a lot of depression."

* On July 29, 2004, Johnson was seen in the emergency room for complaints of right shoulder and neck pain for the past four days, with intermittent spasms and tingling. Johnson attributed this to pulling weeds, and said her

>   symptoms were "typical of previous exacerbations." She denied wrist pain, hand pain, and finger pain.

\*   At the hearing before the ALJ on September 9, 2004, Johnson's attorney reiterated a request that Johnson be sent for evaluation of her carpal tunnel syndrome, and additionally sought orthopedic examination of the shoulder. Johnson testified at the hearing that her fingers were totally numb on the ends, and that her right arm was numb almost up to the elbow and she could not lift it above her waist without pain all the way up to the neck. She said that her condition had been worsening ever since she quit working. She had pain in her left hip, causing leg spasms if she sat "too long." The pain in her hands would wake her at night, and the numbness caused her to drop things. She testified that she had made the hospital visit because her arm was "hurting so bad then that I couldn't stand it," and she was not taking medications at the time of the hearing because she had no money to pay for them. She tried to alleviate her arm and neck pain by lying down, and by using cold packs, and to alleviate her hip pain by walking around. She would lie down four or five times a day. She could not use a broom because her right arm did not have the strength to pull it toward her, and she

mostly just let the arm "hang." She could not button her pants, and had to lay down and pull them up with her left hand. She was depressed by her inability to work. She spent her days walking a little, and talking to her small dog. She could only walk 10 or 15 minutes before her left leg started giving her trouble. She could sit for 20-30 minutes. She shopped for groceries, but only in 15-minute increments, and had trouble carrying her groceries. She could not drive because of the condition of her arm - she had trouble turning the steering wheel and looking over her shoulder. She did not do any lifting with her right arm, although she is right-handed. She could no longer crochet, or hold a book to read. She testified that she never did have surgery for carpal tunnel syndrome. She lived with a friend, and was supposed to do yard work to pay her rent, but could not do anything except pick up limbs. She could not rake, pull weeds, or push a mower. She kept her dirty clothes picked up, and could put her dirty dishes in the sink but could not "seem to get them back out of there." She used paper cups and plates often.

     5. The Court is persuaded that this matter must be remanded. The medical information in the file is not sufficient to allow an informed decision about residual functional capacity

to be made, given the lack of objective information about Johnson's hand and arm condition, especially as it pertains to her dominant right hand.

Johnson sustained an injury to her right shoulder in 1993, but the records of that injury and treatment were not obtained and reviewed. From the time of her shoulder injury forward, Johnson began to experience problems with her right shoulder, arm, wrist, and hand. Abnormalities in the median nerve conduction velocities of both hands were objectively demonstrated by Dr. Davis in December, 1994. It appears that Johnson did not receive treatment of the problem for financial reasons. She ultimately left work as a result of her hand and arm condition, being unable to perform the repetitive motions of her job.

In her paperwork and testimony, Johnson described progressive numbness in her hands; dropping objects; pain going up her arm into her shoulder; pain caused by repetitive movement; inability to turn the steering wheel of a car, close buttons, pull up her pants or hold a book while reading; and eventually even difficulty in lifting her right arm above her waist. While the ALJ did not fully credit this testimony, and it may represent an exaggeration of her condition, these problems are all consistent with carpal tunnel syndrome untreated over a ten-year period.

Dr. Conover observed Johnson's enlarged hands and swollen joints, and diagnosed carpal tunnel syndrome, but the testing done

during his examination was not sufficient - given the duration of the condition and Johnson's subjective descriptions of her condition - to determine whether Johnson could be gainfully employed.  Dr. Conover merely estimated Johnson's grip strength, and asked her to hold a pen and write, touch fingertip to palm, oppose thumb to finger, and pick up a coin.  These actions could have been performed in the space of two or three minutes, and do not demonstrate that Johnson would be capable of performing "full time competitive work," **Ross v. Apfel**, **218 F.3d 844, 849 (8th Cir. 2000)**.  They are not an adequate substitute for nerve conduction studies.

Carpel tunnel syndrome is not necessarily disabling, but its effects must be appropriately evaluated.  It

> results from compression of the median nerve in the volar aspect of the wrist," and "produces paresthesias in the radial-palmar aspect of the hand plus pain in the wrist, in the palm, or sometimes proximal to the compression site in the forearm and shoulder.  The pain may be more severe at night.  Sensory deficit in the palmar aspect of the first 3 digits and/or weakness and atrophy in muscles controlling thumb abduction and apposition may follow. The syndrom is relatively common, may be uni- or bilateral, and occurs more often in women.  It is particularly associated with occupations that require repeated forceful wrist flexion. . . . If symptoms continue or progress, surgical decompression of the median nerve at the wrist is required.

**The Merck Manual**, **16th Ed.**

The Court finds that nerve conduction studies and other appropriate tests will be required to determine whether Johnson is capable of working, given the severity of her condition as she

describes it, the objective tests from 1994 which indicate that nerve abnormalities existed then, and the length of time that the condition has gone untreated. It may well be that at this point irreversible damage has been done to the nerves of Johnson's hands, with concomitant impact on her ability to perform work.

The Court also finds that the ALJ should obtain Johnson's medical records from Dr. Park with regard to the 1983 shoulder injury for assistance in determining the extent of her right upper extremity problems.

6.   The Court also agrees with Johnson that the ALJ erred in failing to consider the combined impact of her impairments, and in not giving sufficient emphasis to her complaints of numbness, pain, and lack of sleep.  In addition, Johnson must struggle with a limited education, borderline intelligence, and major depression.  The ALJ is required to consider the combined effect of all a claimant's impairments without regard to whether any impairment, if considered separately, would be disabling.  "The ALJ must consider the impairments in combination and not fragmentize them in evaluating their effects."  **Delrosa v. Sullivan**, 922 F.2d 480 (8th Cir. 1991).

Accordingly, the Court reverses the decision of the Commissioner, and remands this case to the Commissioner for further consideration in accordance with this Judgment, pursuant to sentence four of **42 U.S.C. §405(g).**

-15-

If plaintiff wishes to request an award of attorney's fees and costs under the Equal Access to Justice Act, an application may be filed up until thirty days after the judgment becomes "not appealable," i.e., thirty days after the sixty-day time for appeal has ended. **Shalala v. Schaefer, 509 U.S. 292 (1993); 28 U.S.C. §§ 2412(d)(1)(B) and (d)(2)(G).**

**IT IS SO ORDERED.**

>                             **/s/Jimm Larry Hendren**
>                             **JIMM LARRY HENDREN**
>                             **UNITED STATES DISTRICT JUDGE**